CONWAY, INC., d/b/a Shamrock Bar and Liquor Store, Appellant and Cross-Appellee,

v.

Cleopatra ROSS, Appellee and Cross-Appellant.

Nos. 4982, 5089.

Supreme Court of Alaska.

May 1, 1981.

Mary E. Guss, Ziegler, Cloudy, Smith, King & Brown, Ketchikan, for appellant and cross-appellee.

Roger W. Carlson, A. Fred Miller, P. C., Ketchikan, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DI-MOND, Senior Justice.

## OPINION

DIMOND, Senior Justice.

Cleopatra Ross entered into an employment contract on September 20, 1976, with Conway, Inc., which does business in Ketchikan as the Shamrock Bar. By the terms of the contract, Ross was to appear as the Shamrock's "feature topless stripper" for nine weeks, from September 22 to November 23, 1976. During the third week of this employment, Conway fired Ross at the request of the Ketchikan district attorney because Ross allegedly had engaged in an act of prostitution during the contract period. Shortly after this, Ross filed suit against Conway in the district court, claiming that Conway's termination of her employment was a breach of their contract.

A trial was held and the district court found that Ross had engaged in one act of prostitution.[1] It concluded, however, that this conduct was not prohibited by the contract and did not justify the termination of her employment. It therefore held that Conway had breached the parties' contract when it fired Ross. The court entered a judgment for Ross, awarding her $1,975.52 as damages for loss of income for the remainder of the contract period. It also awarded attorney's fees and costs to Ross.

Conway appealed to the superior court, which affirmed the judgment. Conway then brought this appeal, arguing that the district court erred in holding that Conway had breached the contract. Ross has cross-appealed, arguing that the superior court

erred when it denied her request for costs and attorney's fees for the appeal to that court. Ross also seeks damages for the delay caused by Conway's appeal to this court.

## I.

◼ We first consider the argument that the district court erred in holding that Conway breached its contract with Ross when it fired her. Conway contends that it was Ross who breached the contract, by engaging in the act of prostitution, and that Conway therefore had good cause to terminate her employment. Conway does not suggest that Ross violated any of the express contract provisions.[2] Conway argues, instead, that Ross breached the implied term of every employment contract that the employee will do nothing which could tend to injure the employer's business interests. However, as Corbin states in his treatise on contracts, "[f]raudulent or otherwise immoral action by the servant in his relations with third persons will justify his discharge only in case such conduct also affects the value of the performance that is due the master." 3A A. Corbin, Corbin on Contracts § 681, at 219 (1960). The question thus becomes whether Conway's business could have been injured if it had continued to employ Ross after learning of her act of prostitution.

Ross's prostitution was unrelated to Conway's business. She did not solicit any of the Shamrock's customers. Her single act of prostitution involved a gentleman she

1. This finding was actually made at a rehearing. After the first trial, the district court entered a judgment for Ross. For reasons not relevant here, Conway appealed the judgment and the superior court ordered an evidentiary hearing as to whether a deposition should be considered with evidence presented at trial.

2. At trial, Ross was asked whether she believed Conway could fire her if she engaged in prostitution while in Kechikan. In response she testified, "That's understood for every contract." The dissent argues that this, coupled with the fact that Conway fired Ross after her act of prostitution, indicates that refraining from acts of prostitution was an implied term of the parties' contract.

We disagree. At most, Ross's testimony suggests what her understanding was of the contract. One party's understanding may be incorrect, and it does not bind the parties or the court. *Wesco Realty, Inc. v. Drewry*, 9 Wash. App. 734, 515 P.2d 513, 515 (1973).

Conway also testified at trial and, although there was ample opportunity to do so, he did not testify that it was an "understood" part of their contract that Ross would refrain from acts of prostitution while in Ketchikan. Instead, Conway testified that he fired Ross because the district attorney's office requested him to do so. Thus, we are not left with a firm and definite conviction that the trial court erred when it concluded that Ross had not breached any term of her contract with Conway.

met apart from the Shamrock Bar. Ross's encounter with this gentleman occurred at her own premises and during the hours she was not working for Conway. In short, there was nothing to connect Ross's act of prostitution with her employment at the Shamrock Bar.

Conway argues that its liquor license could have been jeopardized if it had not discharged Ross when the district attorney requested it to do so.[3] 15 AAC 20.010 sets forth the only grounds upon which the Alcoholic Beverage Control Board can suspend or revoke a license. It provides in part as follows:

The following are the grounds which constitute a basis for the possible suspension or the revocation of licenses:

(1) when the continuance of a license would be contrary to the best interest of the public . . .;

(2) a violation of any Alcoholic Beverage Control Board rule or regulation by a licensee, his agent or employee;

(3) the misrepresentation of a material fact by an applicant in obtaining any license;

(4) the plea, verdict, or judgment of guilty to any public offense involving moral turpitude or violation of any law concerning the manufacture, barter, sale and possession of intoxicating liquors;

(5) where the portion of the premises of the licensee upon which the activities permitted by the license are conducted are a resort for illegal possessors or users of narcotics, prostitutes, pimps, panderers or sexual perverts . . .;

(6) failure to correct objectionable conditions within a prescribed time or reasonable time after receipt of notice to make such correction issued by the Alcoholic Beverage Control Board or agent thereof;

(7) disciplinary action by military or naval authorities against any licensed premises;

(8) any failure to comply with the laws, rules and regulations pertaining to public health in Alaska;

(9) conviction of a charge of gambling within the limits of any licensed premises.

Employing an individual who has engaged in one act of prostitution is not specified as grounds for suspending or revoking a license. Conway contends, however, that the board could have taken action against its license under section 1 or 5 of the regulation. Conway's license could not have been revoked or suspended under section 5 because that section specifically requires a nexus between the licensed premises and activities related to prostitution. Ross's liaison was consummated entirely apart from her employment at the Shamrock Bar. She did not solicit any of the bar's patrons and any of her activities related to prostitution occurred away from the bar's premises.

Similarly, while the language of section 1 is broad, we do not believe it could have provided authority for the board to have taken action against Conway's license if Conway had not fired Ross. The continuance of Conway's license did not suddenly become "contrary to the best interest of the public" merely because one of Conway's employees engaged in an act of prostitution on her own time, at her own place and through her own contacts. The complete separation of Ross's prostitution-related activities from her employment with Conway prevented these activities from injuring Conway's business interests.

Assuming Conway realized that Ross's conduct could not directly jeopardize its liquor license, Conway may have thought that the district attorney's request that Ross be fired provided good cause in itself for Conway to fire Ross. We would not agree. As we have noted, permitting Ross to continue working would not have violated any statute or regulation and the district

---

**3.** We note that only the Alcoholic Beverage Control Board can suspend or revoke liquor licenses. AS 04.15.100. *See generally* Title 4 of the Alaska Statutes (Alcoholic Beverages). If Conway had refused to discharge Ross, the

district attorney could not have suspended or revoked Conway's license, nor could he have compelled the board to do so. Thus, refusing to act upon the district attorney's request could not in itself have jeopardized Conway's license.

attorney's request was, in that sense, unjustified. As such, it did not provide good cause for Conway to fire Ross.[4] Conway's possible fear of reprisals from the authorities if it did not act upon the district attorney's request would similarly not provide cause for firing Ross because no action could be taken against Conway as long as its business activities complied with the law. The situation brought about by the district attorney's request may have been a difficult one for Conway, but Conway could hardly have expected to operate a topless bar without encountering some difficulties similar to this. We agree with the district court that Conway did not have good cause to fire Ross and we therefore affirm its judgment in Ross's favor.

## II.

Ross cross-appeals from the superior court's denial of her request for attorney's fees and costs for the appeal to that court. The superior court ordered the parties to bear their own costs and attorney's fees without indicating its reason for the order. Ross contends, first, that the court erred when not stating its reason for denying her request, and second, that the court abused its discretion when denying the request.

We have held that under Civil Rule 82 a trial court must state its reasons for denying an award of fees and costs to the prevailing party. *Curran v. Hastreiter*, 579 P.2d 524, 530–31 (Alaska 1978); *Stordahl v. Government Employees Insurance Co.*, 564 P.2d 63, 68 (Alaska 1977). However, an appellate court's award of costs and fees is not governed by Civil Rule 82. As we noted in *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Service, Inc.*, 592 P.2d 1200, 1204–05 (Alaska 1979), the rule which is most nearly applicable is Appellate Rule 29(d), which provides in part, "Where costs are allowed in this court, attorney's fees may also be allowed in an amount to be determined by the court."

Nonetheless, we believe that the rationale for requiring a trial court to state its reasons when denying an award of fees is equally applicable to appellate proceedings. We held that a trial court must state its reasons for denying an award because, although such an award is discretionary and reviewable only for abuse of discretion, the reviewing court must be able to determine whether the denial was an exercise of that discretion, or the result of a possibly mistaken belief that the requesting party was not entitled to any fees. *Curran v. Hastreiter*, 579 P.2d at 530–31. The same information is necessary to review a superior court's denial of an award of fees when it is acting in its appellate capacity. We therefore hold that when the superior court acts in its appellate capacity it must state its reasons for denying a request for attorney's fees. We reiterate, however, our observation in *Kodiak Western* that, even though one party emerges as the clear victor from an appeal, there is no requirement that fees be awarded as a matter of course under Appellate Rule 29(d). 592 P.2d at 1205.

In this case, we cannot determine whether the superior court was exercising its discretion when it denied an award of fees and costs to Ross, or whether it believed that such an award was not permissible. We think that under Appellate Rule 29(d) the court could have awarded fees and costs to Ross as the prevailing party in the appeal, inasmuch as it affirmed the district court's judgment in her favor. We therefore find it necessary to remand this case to the superior court for further consideration on the issue of attorney's fees and costs.

## III.

Ross has requested an award of damages pursuant to Appellate Rule 31(a) for the delay caused by the present appeal. Rule 31(a) provides in part:

> Where an appeal . . . shall delay the proceedings in the superior court or the en-

---

4. There is no indication that the district attorney even knew about Conway's contract with Ross, let alone that he advised Conway as to whether firing Ross would or would not be a breach of the contract. Thus, we need not decide whether reliance upon advice by a district attorney could justify the termination of an employment contract such as the one Conway and Ross entered into.

forcement of the judgment or order of the superior court, and shall appear to have been sued out merely for delay, damages may be awarded in addition to interest, costs and attorney's fees.

Ross has not established that this appeal was taken merely to delay enforcement of the district court's judgment. We find no basis for awarding damages under the rule and we therefore deny the request.

The judgment of the district court is AFFIRMED and we REMAND the case to the superior court for further consideration of the issue of attorney's fees and costs consistent with this opinion.

RABINOWITZ, Chief Justice, dissenting.

The majority correctly perceives that Cleopatra Ross has been wronged in this case; however, I cannot agree with the majority's conclusion. If Cleopatra Ross has a remedy, it is not against Conway, Inc., d/b/a the Shamrock.

It is not seriously disputed that Cleopatra did engage in an act of prostitution with one A. Otto Lincoln.[1] The district court made this finding of fact, with which the superior court agreed, and the majority does not take issue.[2] My conclusion that Cleopatra Ross cannot recover is not, however, based on the moral reprehensibility of her conduct. Indeed, assuming the applicability of a moral litmus, she places a distant second to the Shamrock. The Shamrock is a local tavern in Ketchikan, of the genre that constantly treads the fine line between mere poor taste and outright illegality.[3] With such establishments, license revoca-

1. Cleopatra Ross does argue that this particular finding by the district court was not supported by the evidence, in that her testimony was presented in person, whereas that of A. Otto Lincoln was submitted by deposition. I cannot agree. The district court was faced with little more than two conflicting bare assertions of fact, and his conclusion was supported by substantial evidence. It is not likely that A. Otto was mistaken about Cleopatra Ross's identity; in the community of Ketchikan, it is unlikely that one would find more than one exotic danger with (according to A. Otto's deposition) "a diamond ring in her nose, which is quite unusual." Nor can I accept the suggestion that A. Otto was, as Ms. Ross contended in her testimony at trial, lying to retaliate for her refusal to kiss him in "Howard's Charcoal Broiler." A. Otto's deposition incriminated himself as well as Ms. Ross; and the lone attempt of her attorney (who was present when A. Otto's deposition was taken) to discredit the witness was unsuccessful, as the only prior crime to which A. Otto would admit was a "[p]olitical crime. I ... was involved against the Russian Communists, and when they were within the border of the country [apparently Rumania] I volunteered fighting against the Russians. Boys that got Congressional Medals of Honor here, I was convicted as an ordinary political criminal."

2. Not only was this finding of an act of prostitution supported by substantial evidence in the record, it appears it was also somewhat unfulfilling, according to A. Otto's description of his $150 fling: "[T]he basic purpose that I was there ... was to go to bed with her which [I] did. It wasn't all that difficult because the bed, I don't suppose it was ever made and the color

TV was constantly playing which I didn't like at all. It made everything look like such commercialized entertainment."

3. At trial, Mr. Conway, the owner of Conway, Inc., admitted that he permitted his employees to solicit drinks for a commission in violation of former AS 04.10.040(b). Indeed, this practice was explicitly included in the rules and regulations appended to Cleopatra Ross's employment contract:

Girls may not drink anything but the house drink while they are on shift. The house drink sells for $3.00 and the girl receives a $1.00 commission on each one they sell. If they sell a tenth of champagne the one to sell it receives a $3.00 commission. If a fifth is sold the commission is $5.00. If a magnum is sold the commission is $10.00.

It was apparently the position of Mr. Conway and his attorney that the statute, and its parallel provision in the Ketchikan Municipal Code, were unconstitutional in that they discriminated on the basis of sex. This concern for social equality, although commendable, was misplaced here, as the statute in question had been rendered sex-neutral in 1974 by the legislature. Ch. 127, § 57, SLA 1974. During the period here relevant, the statute read, in pertinent part, as follows:

(b) A citizen of the United States, over the age of 19 years and of good moral character, may be regularly employed as a waiter or waitress in an establishment operating under a beverage dispensary license. The duties of waiters and waitresses employed therein shall be confined to taking orders and serving beverages, alcoholic or otherwise, and food. Waiters and waitresses employed under this

tion never falls below the level of a distinct possibility, and this fact was apparent to Conway, Inc., d/b/a the Shamrock. The superior court noted that the local police maintained a "close scrutiny" of the tavern; and its position was evidently precarious enough that an admonishing telephone call from the district attorney triggered this litigation. However, the Shamrock's affinity for the green was such that it never allowed such considerations to interfere with its pursuit of profits. And yet the Shamrock's attitude towards its "girls" was somewhat schizophrenic. On the one hand, it clearly wanted to hold out to its customers the pleasurable prospect of following in A. Otto's footsteps, and thus such regulations as: "Girls are expected to mix with all the customers not to sit all together at one table"; "Keep your boy friends out of the club"; and "Girls must dance topless for one song out of each three songset." On the other hand, it is also clear that the Shamrock intended its customers' reaches to exceed their grasps, and thus: "No leaving the bar with men" and "No men will be allowed in the living quarters." As the superior court noted, "As best I can interpret it, the dancers are required to tease but are not expected to connect."

Thus, I share with the majority some sympathy for Cleopatra Ross's position here; the Shamrock's objections to her exploitation of her body for financial gain ring a trifle hollow, in light of its own clear intent to do the same.[4] However, I am convinced that a proper application of the principles of contract law leads to the conclusion that the discharge was justifiable, in that Ms. Ross had violated a condition of the employment contract.

Resolution of the issue must start with an assessment of the contract itself. The document appears to be a form contract put out by "Danny Zezzo's Dancers A–La Carte,"[5] with a copy of the Shamrock's rules and regulations attached. It contains no express provision prohibiting prostitution. However, "contractors can 'express' their intentions otherwise than by the use of specific words." 3A A. Corbin, *Contracts* § 631 (1960). Here, I think that both parties evinced an understanding that the contract would be terminable if Cleopatra Ross engaged in prostitution. The Shamrock did so by its actions in terminating her employment; Ms. Ross did so even more explicitly, at trial, where she testified that it was her understanding that, if she engaged in prostitution in Ketchikan, Mr. Conway could terminate the contract.

Even if resort must be made to a "constructive" condition (*i. e.*, one implied in law) as the majority assumes, I must disagree with the majority's conclusion, although not with its analysis: "The question thus becomes whether Conway's business could have been injured if it had continued to employ Ross after learning of her act of

section may not solicit or encourage the purchase of beverages, alcoholic or otherwise, by the patron of the premises, whether the beverage is for the patron or for another. No waiter or waitress may accept any beverage, alcoholic or otherwise, purchased for him or her by a patron of the establishment.

Nothing in this separate opinion shall be taken as expressing any view of nude dancing as it relates to the constitutional guarantees of freedom of speech and expression. Such issues are before this court in *Mickens v. Kodiak*, File No. 5628.

4. Indeed, in light of the parallel aims of the Shamrock and Ms. Ross, it might also be said that the Shamrock is asking us to find an implied condition on Ms. Ross's part not to compete, which, being subject to a rule of strict construction as a covenant in restraint of trade, should not lightly be implied. *See* 6A A.

Corbin, Contracts § 1392 (1962). However, the parties do not raise this argument.

5. Although it took a while to establish this point, it appears that Danny Zezzo was Cleopatra Ross's agent:

Q. And, Miss Ross, could you identify the signature on that contract?
A. Yes. In the left-hand corner, there's the agent that I work for.
Q. And what is his name?
A. Danny Zezzo.
Q. Excuse me, what's that name?
A. Danny Zezzo.
Q. Danny Zezzo?
A. Um-hm.
Q. And whose agent is he?
A. He's my agent.
Q. I see. All right. Please continue.

prostitution." I would be inclined to answer this question as the majority has, were we considering solely the conduct of Cleopatra Ross herself; but here, her conduct must be coupled with that of the district attorney who, although the record contains no evidence that he attempted to convict this latter-day Queen of the Nile through proper channels (perhaps due to A. Otto's somewhat casual attitude toward court attendance),[6] took it upon himself to rid Ketchikan of Ms. Ross by applying pressure on the hapless Conway, Inc., d/b/a the Shamrock. This venerable institution was, like virtually all the characters in this drama, caught in a compromising position. Conway, the owner, admitted at trial that the Shamrock consistently violated at least one law, former AS 04.10.040(b) and a parallel provision in the Ketchikan Municipal Code; indeed, the violation is explicitly required as part of the contract in the record.[7] This would have constituted grounds for action by the Alcohol Beverage Control Board and perhaps independently by the district attorney, and thus I think Conway's fear of reprisals was not unjustified. Even assuming the majority is correct in concluding that the district attorney's attempts to get the ABCB to revoke the Shamrock's license would ultimately have proven groundless, the Shamrock would have been put through considerable expense and effort in defending its rights to retain its license and Cleopatra's right to remain free of unwarranted intrusions by the district attorney into her contractual relations with the Shamrock. Especially since the case law indicates that a tendency to injure, rather than actual injury to, the employer's business is all that

need be shown,[8] I must conclude that the Shamrock has demonstrated that Cleopatra Ross has violated the constructive covenant noted above,[9] and discharge was therefore justified. I do concur in the majority's statement that the district attorney's actions here were unjustified.

MATTHEWS, Justice, dissenting.

Because I agree with the legal analysis set forth in the dissenting opinion of Chief Justice Rabinowitz, I would reverse the judgment of the district court. I do not, however, join in those portions of that opinion which characterize the moral quality of the acts of the various participants involved in this case.

---

**6.** At the original trial of this matter, the district court judge refused to admit A. Otto's deposition because A. Otto, although subpoenaed on the day of his deposition (the day preceding trial), was not present at the trial itself. The superior court overturned this ruling in a prior decision, which we summarily upheld.

**7.** See n. 3 supra.

**8.** See Wyatt v. Brown, 42 S.W. 478, 481–82 (Tenn.App.1897).

**9.** See also 3A A. Corbin, Contracts § 681 (1960): "To a candid observer, it would seem

that such conduct as drunkenness, sexual immorality, or persistent lying, would justify the discharge of a minister of the gospel, a Y.M. C.A. secretary, or the superintendent at a home for children. The employer in such cases could reasonably expect that the value of the promised performance would be gravely affected." Although Cleopatra Ross does not fit any of these categories precisely, I think that the value of her promised performance would be gravely affected, and thus the same principle applies.